WALTER M. AND CAROL J. ZIDANICH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WILLIAM A. AND IRIS E. STEINBERG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zidanich v. Commissioner
Docket Nos. 21393-85, 30120-85.
United States Tax Court
T.C. Memo 1995-382; 1995 Tax Ct. Memo LEXIS 386; 70 T.C.M. (CCH) 367; August 14, 1995, Filed *386 Decision will be entered under Rule 155. Lois C. Blaesing and Chauncey W. Tuttle, Jr., for petitioners. Mary P. Hamilton, Paul Colleran, and William T. Hayes, for respondent. FAY, Judge. WOLFE, Special Trial Judge FAY; WOLFE
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] They were tried and briefed separately but consolidated for purposes of opinion. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: These cases are part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, *387 affd. without published opinion 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transaction in these cases are substantially identical to those in the Provizer case. Through a third tier partnership, AMBI Real Estate (AMBI), petitioner Iris E. Steinberg invested in Efron Investors (EI). Through EI, a second tier partnership, petitioners Carol J. Zidanich and Iris E. Steinberg invested in the Clearwater Group limited partnership (Clearwater), the same partnership considered in the Provizer case. Pursuant to petitioners' requests at trial, this Court took judicial notice of our opinion in the Provizer case. In a notice of deficiency issued by certified mail on April 12, 1985, respondent determined deficiencies in the joint 1978 and 1981 Federal income taxes of petitioners Walter M. and Carol J. Zidanich (the Zidanichs) in the amounts of $ 660.60 and $ 10,823, respectively. In a notice of deficiency issued by certified mail on June 10, 1985, respondent determined deficiencies in the joint 1978 and 1981 Federal income taxes of petitioners William A. and Iris E. Steinberg (the Steinbergs) in the respective amounts of $ 2,849 and $ 5,863. *388 In the notices of deficiency, respondent also determined that the deficiencies in the Zidanichs' 1978 and 1981 Federal income taxes and the Steinbergs' 1981 Federal income tax were substantial underpayments attributable to tax-motivated transactions and that, as a result, interest on those deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c). [2] The deficiency for taxable year 1978 in each of these cases results from disallowance of a business energy credit carryback from taxable year 1981. *389 In addition to the above deficiencies and additions to tax, in amended answers respondent asserted the following additions to petitioners' Federal income taxes: Additions to Tax
Docket No.
Petitioners
Year
Sec. 6653(a)
Sec. 6659
Sec. 6621(c)
21393-85
Zidanich
1978
$ 33
--
--
1981
[1]
$ 2,695
--
30120-85
Steinberg
1978
142
854
[2]
The only issues remaining for our decision in docket No. 30120-85 relate to the business energy credit claimed on the Steinbergs' 1981 Federal income tax return and the portion of that credit carried back to their 1978 Federal income tax return. On March *390 23, 1987, the parties filed a Stipulation of Agreed Adjustments with respect to Iris E. Steinberg's investment in AMBI. The stipulation states that the Steinbergs held a 50-percent interest in AMBI in 1981 and that AMBI held interests in five partnerships during 1981. The stipulation also states: AMBI's allowable distributive share of loss from four of the five partnerships is as follows:
Jacobson-Stewart Lansing Properties
($ 17,276)
Spring Valley Apts., Ltd.
(14,864)
Country Club Marina Apts.
(14,851)
Broadmanor Associates
(47,593)
(94,584)
Therefore, the parties in docket No. 30120-85 stipulated that the Steinbergs are entitled to claim losses in the amount of $ 47,292 (50 percent of $ 94,584) with respect to their investment in AMBI. They further stipulated that AMBI's distributive share of loss from the fifth partnership, Efron Investors, and the amount of any investment credit attributable to Efron Investors and flowing through to AMBI, remained in dispute. On their 1981 Federal income tax return, the Steinbergs claimed gross income of less than $ 40,000. Accordingly, as a result of the stipulation, the Steinbergs had no taxable income for 1981 and no *391 underpayment exists with respect to their 1981 taxable year. The issues in these consolidated cases are: (1) Whether the assessments are barred by the statute of limitations; (2) whether expert reports and testimony offered by respondent are admissible into evidence; (3) whether petitioner Carol J. Zidanich is entitled to claimed deductions and tax credits with respect to Clearwater as passed through EI and whether Iris E. Steinberg is entitled to claimed tax credits with respect to Clearwater as passed through both EI and AMBI; (4) whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a) for 1978 and whether the Zidanichs are liable for the negligence additions to tax under section 6653(a)(1) and (2) for 1981; (5) whether the Zidanichs are liable for the addition to tax for 1981 under section 6659 for underpayment of tax attributable to valuation overstatement and whether the Steinbergs are liable for the section 6659 addition to tax for 1978; and (6) whether the Zidanichs are liable for increased interest under section 6621(c) for 1978 and 1981, and whether the Steinbergs are liable for increased interest *392 under section 6621(c) for 1978. [3]
FINDINGS OF FACT Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference. The Zidanichs resided in Hammond, Indiana, when their petition was filed. The Steinbergs resided in Arlington Heights, Illinois, when their petition was filed. In 1981 Walter M. Zidanich (Mr. Zidanich) was a *393 steel worker, and Carol J. Zidanich (Mrs. Zidanich) was a legal secretary at Efron and Efron, P.C. Mrs. Zidanich has been a legal secretary at the law firm of Efron and Efron, P.C., since 1958. In 1981, she was Morton L. Efron's secretary. Prior to becoming Morton L. Efron's secretary, she was the secretary for Morton L. Efron's father. During 1981, William A. Steinberg (Mr. Steinberg) was a sales representative, and Iris E. Steinberg (Mrs. Steinberg) was not employed outside the home. Mrs. Steinberg is a partner in AMBI, which is a limited partner in EI. Mrs. Zidanich is also a limited partner in EI. EI is a limited partner in the Clearwater limited partnership. The Clearwater limited partnership is the same recycling partnership that we considered in Provizer v. Commissioner, T.C. Memo. 1992-177. The underlying deficiencies remaining in dispute in these cases resulted from respondent's disallowance of claimed losses and tax credits that were passed through both Clearwater and EI to Mrs. Zidanich and AMBI, and further passed through AMBI to Mrs. Steinberg.[4]
*394 Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, supra.[5] Those facts may be summarized as follows. In 1981, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel expanded polyethylene (EPE) recyclers to ECI Corp. for $ 5,886,000 ($ 981,000 each). ECI Corp., in turn, resold the recyclers to F & G Corp. for $ 6,976,000 ($ 1,162,666 each). F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. We refer to these transactions collectively as the Clearwater transaction. The fair market value of a Sentinel EPE recycler in 1981 was not in excess of $ 50,000. *395 PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC based on the quality and amount of recycled scrap. In 1981, EI acquired a 43.313-percent limited partnership interest in Clearwater, Mrs. Zidanich acquired a 1.596-percent limited partnership interest in EI, and AMBI acquired a 3.194-percent limited partnership interest in EI. Mrs. Steinberg was a general partner in AMBI and held a 50-percent interest in AMBI during 1981. As a result of passthrough from Clearwater and EI, Mrs. Zidanich deducted an operating loss in the amount of $ 4,469 and claimed investment tax and business energy credits totaling $ 9,644. The Zidanichs used $ 8,984 of those credits on their 1981 Federal income tax return and carried the remaining business energy credit, $ 660, back to taxable year 1978. As a result of passthrough from Clearwater, EI, and AMBI, Mrs. Steinberg deducted an operating loss in the amount of $ 4,472 and claimed a business energy credit in the amount of $ 4,833. [6] The Steinbergs did not use any *396 of the credits claimed with respect AMBI, EI, and Clearwater on their 1981 Federal income tax return, but carried back $ 2,849 of the claimed credits to 1978. [7] Respondent disallowed the Zidanichs' claimed deductions and credits related to EI's investment in Clearwater for 1981 and disallowed all of the Steinbergs' claimed deductions and credits related to AMBI for 1981. In 1981, Morton L. Efron (Efron) and Mrs. Steinberg invested in EI through AMBI. AMBI is an Indiana limited partnership that was formed after the death of Mrs. Steinberg's father as an investment vehicle for Mrs. Steinberg, Mr. Steinberg, Efron, and his spouse (Anita Efron). [8] The only funds *397 that Mrs. Steinberg invested in AMBI were funds that she inherited from her father. In 1981 AMBI invested in five limited partnerships. The parties stipulated AMBI's allowable distributive share of loss from four of the five partnerships. See supra pp. 4-5. The fifth partnership in which AMBI invested was EI. EI is an Indiana limited partnership that was formed in May of 1981 by Efron as the general partner and Real Estate Financial Corp. (REFC) as the initial limited partner. Fred Gordon (Gordon) is the president of REFC, which is owned by members of Gordon's family. EI was formed to acquire limited partnership interests in an office building in Buffalo, New York (the office building), and a shopping center in Haslett, Michigan (the shopping center). In contemplation of these ventures, EI prepared a private placement memorandum (the original offering memorandum) and distributed it to potential limited partners. At some time in late 1981, EI abandoned the contemplated *398 investment in the shopping center and substituted limited partnership interests in Clearwater and a K-Mart shopping center in Swansea, Massachusetts (the K-Mart investment). The revised investment objectives were presented in a revised offering memorandum (the revised offering memorandum). This memorandum indicated that EI intended to invest in 100 percent of the limited partnership interests in the office building (10 units), 43.75 percent of the limited partnership interests in Clearwater (7 units), and 15.625 percent of the limited partnership interests in the K-Mart investment (2-1/2 units). Potential EI limited partners were informed of the change in EI's investment objectives through informal conversations and the revised offering memorandum. MFA Corp. (MFA) is the ministerial agent for EI. Efron owns 50 percent of the stock of MFA, and REFC owns the remaining 50 percent. The revised offering memorandum provides that Efron, as general partner of EI, and MFA, as the ministerial agent for EI, will receive substantial fees, compensation, and profits from EI. The contemplated payments to MFA include: (1) $ 100,000 for supervisory management of the office building and ministerial *399 fees; (2) $ 100,000-$ 125,000 as loan commitment fees; (3) $ 25,000 for note collection guarantees; and (4) a maximum of $ 100,750 in investment advisory fees. In addition, MFA was also the ministerial agent for the office building limited partnership and, according to the revised offering memorandum, received substantial payments in that capacity. Efron obtained financing for the EI investments through local banks. Some of the limited partners in EI made a cash downpayment to EI and then signed installment promissory notes for the remainder of the purchase price. Thereafter, Efron pledged any promissory notes received from limited partners as security for loans to EI. In addition to lending funds directly to EI, the banks also offered loans to individual limited partners for the downpayments needed with respect to the EI investments. AMBI subscribed to purchase one-half of a limited partnership unit ($ 50,000) in EI, and Mrs. Zidanich subscribed to purchase one-fourth of a limited partnership unit ($ 25,000). Mrs. Steinberg obtained the funds for investment in AMBI from her inheritance from her father. The record does not include any additional evidence concerning the financing *400 of AMBI's investment in EI. Mrs. Zidanich acquired her interest in EI in exchange for a cash payment in the amount of $ 10,081.25 and a promissory note bearing interest at the rate of 11 percent per year with payments due in the amounts of $ 10,451.25 and $ 4,467.50, on January 15, 1982 and 1983, respectively. Mrs. Zidanich borrowed some or all of the funds she required to finance acquisition of her interest in EI from the First Bank of Whiting through Donald Cassaday (Cassaday), an officer of the First Bank of Whiting. [9] The note was secured solely by Mrs. Zidanich's investment in EI, and payments on the note were to be paid from tax refunds generated from the investment and any cash flow from Mrs. Zidanich's EI investment. Cassaday acted as Mrs. Zidanich's offeree representative with respect to the EI offering and certified that he reviewed the original offering memorandum with Mrs. Zidanich. Cassaday was also involved with arranging the financing for EI with Efron. *401 In 1981 Mrs. Zidanich learned of EI and the Clearwater transaction from Efron, her employer. Mrs. Zidanich has worked for Efron and Efron, P.C., since 1958. She is Efron's legal secretary and had been Efron's father's legal secretary prior to his death. She typed some of the EI offering materials in her capacity as Efron's secretary. In 1981, Mrs. Steinberg was not aware that AMBI had invested in EI. Efron made all of the investment decisions for AMBI and did not consult Mrs. Steinberg concerning AMBI's investments. Prior to his death, Mrs. Steinberg's father was her financial adviser. After the death of her father, Mrs. Steinberg consulted her brother, Efron, for investment advice. She granted Efron the authority to invest all of the inheritance she had received from her father. She intended to use the inheritance moneys and any funds generated therefrom as retirement income since Mr. Steinberg did not have a pension plan. Efron was the general partner of EI. In addition, he owned limited partnership interests in EI through Efron and Efron Real Estate, a partnership owned by Efron and his wife, and AMBI. EI was the first partnership for which Efron served as a general partner. *402 Efron organized EI so that he could earn legal fees and fees for managing the partnership. He received compensation and fees as the general partner of EI and as a 50-percent shareholder of MFA. Efron learned of the Clearwater transaction from Gordon. In 1981 Gordon was counsel to EI, to Efron as the general partner of EI, to Efron personally, and to MFA. He and Efron have known each other since meeting at the University of Michigan in 1955. In the early 1960's Efron and Gordon began investing together in the stock market, real estate, business loans, and other investments. Gordon is an attorney who holds a master's degree in business administration and at one time was employed by the Internal Revenue Service. Prior to the date of the Clearwater private placement offering, Gordon had experience involving the evaluation of tax shelters. Gordon was paid a fee in the amount of 10 percent of some investments he guided to Clearwater; however, he did not receive a fee directly from Clearwater for the EI investments. Efron was aware that Gordon received commissions from the sale of some units in recycling ventures. [10] Gordon recommended investing in the Clearwater offering to the investors *403 in EI, as well as to some of Gordon's other clients. *404 Mrs. Zidanich is a high school graduate, but has no formal education beyond high school. Mrs. Steinberg holds a bachelor of science degree in education from the University of Illinois. Mr. Steinberg has "some college" education. Petitioners do not have any formal training or work experience in investments. Petitioners do not have any education or work experience in plastics recycling or plastics materials. Petitioners did not independently investigate the Sentinel recyclers. Petitioners did not see a Sentinel recycler or any other type of plastics recycler prior to participating in the recycling ventures. OPINION In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case involving the Clearwater transaction and another tier partnership, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $ 50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) *405 held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the Clearwater transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers. Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that the investments in the Sentinel EPE recyclers in these cases were similar to the investment described in Provizer v. Commissioner, supra, and, pursuant to their request, we have taken judicial notice of our opinion in the Provizer case. Mrs. Steinberg invested in EI through AMBI, and Mrs. Zidanich invested directly in EI, a tier partnership that invested in Clearwater. The underlying transaction in these cases (the Clearwater transaction), and the Sentinel EPE recyclers considered in these cases, are the same transaction and machines considered in Provizer v. Commissioner, supra.
Issue 1. Statute of Limitations In their petitions, petitioners allege that the notices *406 of deficiency were not issued within the statutory limitations period. This issue appears to have been abandoned. [11] None of the trial memoranda or briefs address the statute of limitations. Regardless of whether the issue was abandoned, the record shows that the notices of deficiency in these cases were issued within the statutory limitations period. In general, section 6501(a) requires assessment of tax *407 to be made within 3 years after a return is filed, whether the return was filed on or after the date prescribed. Section 6501(b)(1) provides that if a return is filed before the due date, for purposes of section 6501, the return shall be considered filed on the due date. When an extension of time to file is obtained, a return that is delivered to the IRS before the extended due date is considered filed as of the day it is delivered to the IRS. Estate of Mitchell v. Commissioner, 103 T.C. 520, 522 (1994). Section 6501(j) provides that deficiencies resulting from credit carrybacks may be assessed within the period applicable to the year that produced the carrybacks. The record does not show the date when the Zidanichs filed their joint 1981 Federal income tax return; however, that return was due on April 15, 1982. See sec. 6072. The earliest date that the Zidanichs' return may be deemed filed for purposes of section 6501 is April 15, 1982. See sec. 6501(b)(1). Respondent mailed the notice of deficiency in docket No. 21393-85 on April 12, 1985, within the 3-year period provided by section 6501(a). Pursuant to an automatic extension of time to file, the *408 Steinbergs' joint 1981 return was received and timely filed by respondent on June 14, 1982. Respondent mailed the notice of deficiency in docket No. 30120-85 on June 10, 1985. The notice of deficiency in docket No. 30120-85 was mailed within the 3-year period of limitations provided by section 6501(a). Because the deficiencies determined by respondent for 1978 in these cases relate solely to business energy credit carrybacks from 1981, the period of limitations under section 6501(a) is governed by the period of limitations applicable to 1981. Sec. 6501(j). As noted above, the statutory period for assessment for 1981 had not expired when respondent issued the notices of deficiency in these cases. Therefore the statutory period under section 6501(j) with respect to the carrybacks to 1978 had not expired when respondent issued her notices of deficiency. Issue 2. Admissibility of Expert Reports and Testimony
Before addressing the substantive issues in these cases, we resolve an evidentiary issue. At trial in both cases, respondent offered in evidence the expert opinions and testimony of Steven Grossman (Grossman) and Richard Lindstrom (Lindstrom). At trial and in their reply *409 briefs, petitioners object to the admissibility of the testimony and reports. The expert reports and testimony of Grossman and Lindstrom are identical to the testimony and reports in Fine v. Commissioner, T.C. Memo. 1995-222. In addition, petitioners' arguments with respect to the admissibility of the expert testimony and reports are essentially identical to the arguments made in the Fine case. For discussions of the reports and testimony, see Fine v. Commissioner, supra, and Provizer v. Commissioner, supra.
For reasons set forth in Fine v. Commissioner, supra, we hold that the reports and testimony of Grossman and Lindstrom are relevant and admissible and that Grossman and Lindstrom are experts in the fields of plastics, engineering, and technical information. We do not, however, accept Grossman and Lindstrom as experts with respect to the ability of the average person, who has not had extensive education in science and engineering, to conduct technical research, and we have limited our consideration of their reports and testimony to the areas *410 of their expertise. We also hold that Grossman's report meets the requirements of Rule 143(f). Issue 3. Deductions and Tax Credits With Respect to Clearwater
The underlying transaction in these cases is substantially identical in all respects to the transaction in Provizer v. Commissioner, T.C. Memo. 1992-177. The parties have stipulated the facts concerning the deficiencies essentially as set forth in our Provizer opinion. Based on these records, we hold that the Clearwater transaction was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Accordingly, we sustain respondent's disallowance of the deductions and credits claimed with respect to Clearwater. Moreover, we note that petitioners in both of the cases at hand have stated their concession of this issue on brief. The record plainly supports respondent's determinations regardless of such concessions. For a detailed discussion of the facts and the applicable law, see Provizer v. Commissioner, supra.
Issue 4. Sec. 6653(a) Negligence
In her first amendment to *411 answer, respondent asserted that the Zidanichs were liable for the negligence additions to tax under section 6653(a) for 1978 and under section 6653(a)(1) and (2) for 1981, and that the Steinbergs were liable for the negligence additions to tax under section 6653(a) for 1978. Because these additions to tax were raised for the first time in respondent's amendments to answer, respondent bears the burden of proof on these issues. Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994); see also, e.g., Plank v. Commissioner, T.C. Memo. 1993-234. In these cases, respondent has failed to introduce evidence persuasive enough to convince us of petitioners' negligence. On the contrary, each of petitioners has presented testimony of special and unusual circumstances to demonstrate affirmatively that in their individual situations and with their particular backgrounds and abilities they acted with due care. Section 6653(a) for 1978 and section 6653(a)(1) for 1981 provide for an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules *412 or regulations. Section 6653(a)(2) for 1981 provides for an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). Petitioners contend that they were reasonable in claiming deductions and credits with respect to Clearwater. To support this contention, petitioners allege that they were so-called unsophisticated investors and that in claiming the deductions and credits, they relied on Efron. Under some circumstances a taxpayer may avoid liability for the additions to tax for negligence under section 6653(a) if reasonable reliance on a competent professional adviser is shown. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), *413 affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Id. In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974). In 1981 Mr. Zidanich was a steel worker, and Mrs. Zidanich was Efron's legal secretary. Mrs. Zidanich is a high school graduate with no formal education after high school. The record does not include any evidence concerning Mr. Zidanich's education. In 1981 upon the recommendation of her employer, Efron, Mrs. Zidanich acquired an interest in EI. Prior to her investment in EI, neither of the Zidanichs had *414 any independent investment experience. Their only investments prior to 1981 were in stocks and bonds financed through withholding from Mr. Zidanich's paychecks and purchased through a company plan. In our view, Mrs. Zidanich's reliance on Efron was reasonable. She relied upon her long-term employer, Efron, in investing in EI and claiming the associated deductions and credits on her joint 1978 and 1981 Federal income tax returns. In 1981, Mrs. Zidanich was Efron's legal secretary. Prior to being Efron's secretary, she was Efron's father's secretary. At the time of her investment in EI in 1981, she had worked for Efron and his father for over 23 years. In the course of her long-term employment for Efron and Efron, P.C., Mrs. Zidanich saw Efron become a millionaire from investments. The Zidanichs were unsophisticated investors, while Efron was successful in financial matters, especially real estate investments. In evaluating the Zidanichs' care in making the investment in EI we consider Mrs. Zidanich's long employment by Efron and Efron of great importance. She began working for Morton Efron's father 4 years before the son graduated from law school. She served as the secretary to the *415 father when he was the senior member of the law firm, and upon his death she became the secretary to the son, Morton Efron. Over the years she did typing and other secretarial work under the direction of Efron and, in earlier years, his father. From her testimony, and particularly her manner in testifying, we conclude that Mrs. Zidanich respected Efron's knowledge and judgment in investment matters. Also, in our view after 23 years of working for Efron and his father, she had no reason to believe that Efron would mislead her in her investment. Our view is that Mrs. Zidanich had good reason to believe that she could rely upon Efron's advice to her because of her many years of employment by Efron and Efron, P.C., as secretary to Efron and his father. She had reason to believe that Efron was familiar with the investment in EI since, working in the office, she had ample opportunity to observe that he had put together the EI investment vehicle and was its general partner. Also, she was aware of Efron's investment success and had reason to question whether she and her husband were equipped to evaluate the proposed investment as well as Efron. We note, again, that because respondent first *416 raised the issue of negligence in her answer, respondent bore the burden of proof on this issue. On this record, not only has respondent failed to satisfy that burden of proof, but petitioners Zidanich have presented credible testimony and other evidence demonstrating that they exercised due care under the circumstances. Given the special relationship between Mrs. Zidanich and Efron, coupled with Mrs. Zidanich's lack of knowledge or education concerning financial matters, we find that Mrs. Zidanich's reliance on Efron was reasonable. In 1981 Mr. Steinberg was a sales representative, and Mrs. Steinberg was not employed outside the home. In 1979 or 1980, Mrs. Steinberg received an inheritance from her father. She intended to use the inherited moneys exclusively for retirement because Mr. Steinberg did not participate in a pension plan. Until his death in 1979, Mrs. Steinberg's father was her financial adviser. She testified that prior to his death, her father told her to "always trust" her brother, Morton Efron, with respect to financial matters. In addition, Mrs. Steinberg was aware that Efron had been very successful in investments prior to 1981. Mrs. Steinberg testified that because *417 of her lack of knowledge concerning investments and also because of her father's advice that she rely on Efron with respect to financial matters, she entrusted all of the inheritance she received from her father to Efron. Efron organized AMBI and invested some of Mrs. Steinberg's inherited funds in this partnership. Mrs. Steinberg's investment in AMBI was the first investment she had made during her lifetime. In 1981, Efron invested additional inherited moneys in AMBI, and AMBI invested in EI. Mrs. Steinberg held a 50-percent interest in AMBI in 1981. Mrs. Steinberg was unaware of the identity of the AMBI investments and did not learn of AMBI's investment in EI or Clearwater until a few months before trial of docket No. 30120-85. Mrs. Steinberg's only knowledge concerning the affairs of AMBI was obtained from her brother, Efron, who merely told her that her investments were "doing fine". The Steinbergs were unsophisticated, moderate-income investors, while Efron, Mrs. Steinberg's brother, was successful in financial matters. Mrs. Steinberg assigned control over the inheritance she received from her father to her brother, Efron. The Steinbergs resided in Illinois, while Efron resided *418 in Hammond, Indiana, where his father had resided prior to his death. Mrs. Steinberg testified that the moneys that she inherited from her father remained in Hammond, Indiana, because she entrusted those funds to her brother, Efron, so that he could invest them for the Steinbergs' retirements. Mrs. Steinberg simply transferred the management of her inheritance entirely to her brother. So far as we can tell from this record, she had no reason to doubt that her brother would try to do well for her. She was aware that he was sophisticated and successful in financial matters. Neither she nor her husband had any significant knowledge of investments or financial matters. Because of the Steinbergs' lack of knowledge concerning financial matters and Efron's sophistication in such matters, and because of the brother-sister relationship between Efron and Mrs. Steinberg, we find that it was reasonable for Mrs. Steinberg to entrust her inheritance to Efron and to rely upon him to invest those funds. We note, again, that because respondent first raised the issue of negligence in her answer, respondent bore the burden of proof on this issue. On this record, not only has respondent failed to satisfy *419 that burden of proof, but petitioners Steinberg have presented credible testimony and other evidence demonstrating that they exercised due care under the circumstances. We hold, upon the particular facts of these cases and upon consideration of the entire records, that the Zidanichs are not liable for the negligence additions to tax under the provisions of section 6653(a) for 1978 and section 6653(a)(1) and (2) for 1981, and the Steinbergs are not liable for the negligence addition to tax under the provisions of section 6653(a) for 1978. Issue 5. Sec. 6659 Valuation Overstatement
In her first amendment to answer in docket No. 21393-85, respondent asserted that the Zidanichs were liable for the additions to tax for valuation overstatement under section 6659 on the underpayment of their 1981 Federal income tax attributable to the investment tax credit and business energy credit claimed with respect to EI and Clearwater. Likewise, in her first amendment to answer in docket No. 30120-85, respondent asserted that the Steinbergs were liable for the addition to tax under section 6659 on the underpayment of their 1978 Federal income tax attributable to the business energy credit *420 claimed on their 1981 Federal income tax return with respect to AMBI, EI, and Clearwater and carried back to their 1978 return. Because these additions to tax were raised for the first time in respondent's amendments to answer, respondent bears the burden of proving that petitioners are liable for the section 6659 additions to tax. Rule 142(a); Vecchio v. Commissioner, 103 T.C. at 196. The underlying facts of these cases with respect to this issue are substantially the same as those in Fine v. Commissioner, T.C. Memo. 1995-222. In addition, with the exception of arguments pertaining to respondent's failure to waive the section 6659 additions to tax, petitioners' arguments with respect to this issue are identical to the arguments made in the Fine case. For reasons set forth in the Fine opinion, we hold that petitioners are liable for the section 6659 additions to tax at the rate of 30 percent of the underpayments of taxes attributable to the disallowed credits claimed with respect to Clearwater. [12]
*421 Petitioners contend that respondent abused her discretion in failing to waive the section 6659 additions to tax pursuant to section 6659(e). Section 6659(e) authorizes respondent to waive all or part of the addition to tax for a valuation overstatement if the taxpayer establishes that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith. Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion. Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994); Fine v. Commissioner, supra.
On these records, we hold that respondent did not abuse her discretion in failing to waive the section 6659 additions to tax. The records in these cases do not show that there was a reasonable basis for petitioners' valuations. In addition, the records fail to indicate that petitioners ever requested a waiver from respondent pursuant to section 6659(e) until briefing after trial. We are reluctant to find that respondent *422 abused her discretion here when, for all the records show, she was not even timely requested to exercise it. See Haught v. Commissioner, T.C. Memo. 1993-58; Lapin v. Commissioner, T.C. Memo. 1990-343, affd. without published opinion 956 F.2d 1167 (9th Cir. 1992). The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position. Accordingly, we hold that respondent's refusal to waive the section 6659 additions to tax is not an abuse of discretion. Issue 6. Sec. 6621(c) Tax-Motivated Transactions
In notices of deficiency, respondent determined that interest accruing after December 31, 1984, on the deficiencies in the Zidanichs' 1978 and 1981 Federal income taxes and on the deficiency in the Steinbergs' 1981 Federal income tax would be calculated under section 6621(c). In an amended answer, respondent also asserted that section 6621(c) applied to the deficiency in the Steinbergs' 1978 Federal income tax. The annual rate of interest under section 6621(c) equals 120 percent of the interest payable under section 6601 with respect *423 to any substantial underpayment attributable to tax-motivated transactions. An underpayment is substantial if it exceeds $ 1,000. Sec. 6621(c)(2). The underlying facts of these cases are substantially the same as those in Fine v. Commissioner, supra. In addition, petitioners' arguments on brief with respect to this issue are verbatim copies of the arguments in the taxpayers' briefs in the Fine case. For reasons set forth in the Fine opinion, we hold that respondent's determinations and assertion as to the applicable interest rate for deficiencies attributable to tax-motivated transactions are sustained, and the increased rate of interest applies to substantial underpayments for the taxable years in issue. [13]
To reflect the foregoing and the Stipulation of Agreed Adjustments in docket No. 30120-85, Decisions will be entered *424 under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the tax years in issue, unless otherwise stated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The notices of deficiency refer to sec. 6621(d). This section. was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744 and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 1989), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 89 sec. 7721(d), 103 Stat. 2400. The repeal does not affect the instant cases. For simplicity, we shall refer to this section as sec. 6621(c)↩.
1. Respondent asserts that the Zidanichs are liable for the addition to tax under sec. 6653(a)(1) in the amount of $ 541 and the addition to tax under sec. 6653(a)(2)↩ in an amount equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.
2. The annual rate of interest under sec.6621(c) for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601↩ with respect to any substantial underpayment attributable to tax- motivated transactions.
3. In the notice of deficiency in docket No. 30120-85, respondent determined that the Steinbergs were liable for increased interest under sec. 6621(c) for taxable year 1981. In her opening brief, however, respondent did not assert that addition to tax. We consider the sec. 6621(c) addition to tax for 1981 determined in docket No. 30120-85 to have been abandoned. Moreover, as a result of the Stipulation of Agreed Adjustments filed in that case, there is no underpayment of the Steinbergs' 1981 Federal income taxes. See supra pp. 4-5. Therefore, sec. 6621(c)↩ does not apply for that year.
4. The deficiency determined for 1981 in docket No. 30120-85 resulted from respondent's disallowance of all losses claimed with respect to Mrs. Steinberg's investment in AMBI. Pursuant to a Stipulation of Agreed Adjustments, the parties in docket No. 30120-85 agreed to AMBI's allowable distributive share of losses from all of the partnerships in which AMBI invested except EI. See supra↩ pp. 4-5.
5. The parties did not stipulate certain facts concerning the Provizers, facts regarding the expert opinions, and other matters that we consider of minimal significance. Although the parties did not stipulate our findings regarding the expert opinions, they stipulated our ultimate finding of fact concerning the fair market value of the recyclers during 1981.↩
6. On their 1981 Federal income tax return, the Steinbergs did not include the purported value of the Clearwater recyclers in their claimed qualified investment for purposes of the regular investment tax credit.↩
7. The record does not disclose how or whether the Steinbergs utilized the remaining credits reported with respect to AMBI, EI, and Clearwater.↩
8. AMBI stands for Anita, Mort, Bill, and Iris.↩
9. The record is unclear as to whether Zidanich borrowed the initial cash payment for her investment in EI from the First Bank of Whiting.↩
10. The Clearwater offering memorandum states that the partnership will pay sales commissions and fees to offeree representatives in an amount equal to 10 percent of the price paid by the investor represented by such person. The offering memorandum further states that if such fees are not paid "they will either be retained by the general partner as additional compensation if permitted by applicable state law, or applied in reduction of the subscription price." EI's Schedule K-1 for 1981 shows that EI paid full price, $ 350,000, for its seven units of Clearwater, so the 10-percent commission was not applied to reduce the subscription price. Gordon specifically stated that in the case of EI he did not directly receive the sales commission. Efron expressed doubt that he individually had been an offeree representative in connection with Clearwater or any other transaction. There are suggestions in the record that the commission might have been paid to MFA or offeree representatives of individual investors.↩
11. In the Stipulation of Agreed Adjustments filed with this Court on Mar. 23, 1987, in docket No. 30120-85, the parties stated: The sole remaining issues in dispute in this case are the petitioners' entitlement to that portion of their claimed distributive loss from AMBI Real Estate Partnership which is attributable to Efron Investors for the taxable year 1981, and their entitlement to an investment credit claimed in the amount of $ 4,833.40 with respect to AMBI Real Estate Partnership, attributable wholly to Efron Investors for the taxable year 1981, of which amount $ 2,849.00 was carried back to 1978.↩
12. Sec. 6659 applies to returns filed after Dec. 31, 1981. Although the Steinbergs filed their 1978 return prior to Dec. 31, 1981, they are liable for the addition to tax under sec. 6659 for 1978 because the underpayment of tax for 1978 is attributable to the carryback of unused tax credits claimed on their 1981 return. See Nielsen v. Commissioner, 87 T.C. 779↩ (1986).
13. Because there is no deficiency in the Steinbergs' 1981 Federal income tax, sec. 6621(c) does not apply to that taxable year. See supra↩ pp. 4-5.